Kenneth **TROUTT,** Plaintiff,

v.

**STAVOLA BROTHERS, INC., d/b/a Stavola Bros. Racing,** Defendant.

**No. 4:94CV00417.**

United States District Court, M.D. North Carolina, Salisbury Division.

Aug. 22, 1995.

Jeffrey L. Bishop, Charlotte, NC, for plaintiff.

Philip Marshall Van Hoy, Paul Bradford Taylor, Van Hoy, Reutlinger & Taylor, Charlotte, NC, for defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff Kenneth Troutt asserts that his former employer, Defendant Stavola Brothers, Inc., d/b/a Stavola Brothers Racing, failed to pay him for overtime hours he worked, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. A bench trial was held on August 7 and 9, 1995, and the court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff Kenneth Troutt is a resident of Cabarrus County, North Carolina.

2. Defendant Stavola Brothers, Inc., d/b/a Stavola Brothers Racing, is a corporation organized under the laws of the State of New Jersey. Defendant operates and maintains a NASCAR Winston Cup racing team that builds and races stock cars in NASCAR sponsored races throughout the United States. Defendant maintains its shop for the building and maintenance of race cars in Cabarrus County, North Carolina.

3. Defendant hired Plaintiff in November 1990, to work as a race car body fabricator. Defendant's general manager at the time, Harry Hyde, hired Plaintiff on behalf of Defendant, and at the time Plaintiff was hired it was agreed that Plaintiff would work from 8:00 a.m. to 5:00 p.m., Monday through Friday, with an unpaid one-hour lunch break each day, for a salary of $800.00 per week. Plaintiff was not required to work on the weekends. However, if Defendant needed an extra person at a race or an emergency arose, Plaintiff could be asked to work on the weekend, but would then not be required to work the corresponding number of hours on the following Monday, so that his hours during any given week would still total forty. Plaintiff's salary was raised to $824.00 per week beginning February 2, 1992, to $848.72 per week beginning February 14, 1993, and to $895.24 per week beginning February 13, 1994.

4. In July 1991, Defendant hired Ken Wilson as its new general manager. Wilson immediately began requiring Plaintiff and other shop employees to work significantly more than forty hours per week in the shop. Normal working hours in the shop became 7:30 a.m. to 6:00 p.m., with additional hours required as needed. Further, Plaintiff was expected to work on race weekends as a member of the pit crew. Plaintiff received no extra compensation for any of the additional hours worked. Plaintiff recorded the additional hours he worked on calendars he began keeping in January 1992. On these calendars, Plaintiff made contemporaneous records of the amount of overtime hours he worked each day, including race weekends. (See Pl.'s Exs. 1, 2, and 3.) Plaintiff did not keep a specific calendar of overtime hours worked prior to January 1, 1992. During Plaintiff's employment, Defendant kept no record of overtime hours worked by its employees.

5. Defendant keeps attendance records of its employees. These records are completed by the office manager at the shop and reflect time that an employee was out of the shop. The persons keeping the records were instructed not to keep overtime on the attendance records. On several dates over the

period 1992 through 1994, these attendance records (see Def.'s Ex. 6) show Plaintiff to be absent from work for periods of fifteen minutes to several hours; however, Plaintiff's records (see Pl.'s Exs. 1, 2, 3) show Plaintiff to be at work. On the other hand, Plaintiff's records also show Plaintiff to be out of work on several occasions for several hours and even entire days when Defendant's attendance records do not show Plaintiff to be absent. The court finds Plaintiff's overtime records to be credible and accurate records of his overtime hours, but in calculating those hours will deduct from Plaintiff's overtime hours those hours that Defendant's attendance records reflect Plaintiff being absent from work.

6. After Ken Wilson began requiring shop employees to work additional hours, Plaintiff approached Ken Wilson about the overtime hours he was working. Plaintiff told Wilson that he did not object to working the hours, but that he expected to be compensated. Wilson told Plaintiff, "You know what your options are," which Plaintiff understood to mean that he could quit or continue working the hours. Plaintiff did not quit because he had recently begun renovations on his home that were burdensome to his finances. Thereafter, on April 15, 1993, Ken Wilson conducted interviews with all of Defendant's shop employees to determine if they had any complaints. A form was completed during each interview which listed the employee's complaints and remarks about working with Defendant. Plaintiff's interview form (see Def.'s Ex. 3) does not reflect any complaint about unpaid overtime wages. However, prior to the interview, Plaintiff had heard from other employees that Defendant was considering laying off employees, and that Ken Wilson wanted the employees to sign a document stating that they had no complaints about their employment. Because of what Plaintiff had heard and Plaintiff's prior conversation with Wilson regarding overtime pay, Plaintiff did not raise the issue of overtime pay during his conference.

7. Defendant posted a FLSA poster in its shop during Plaintiff's employment which explained generally the FLSA's wage and overtime provisions. However, Defendant never asked an attorney, the Department of Labor, or anyone else about its compliance with the overtime requirements of the FLSA with respect to its shop in Cabarrus County. Ken Wilson testified that he had been in racing all of his life and had never heard of racing team employees being entitled to overtime, and thought that overtime compensation was ridiculous. In addition, one of Defendant's office managers, Mona Etter, was once asked by a shop employee to keep records of overtime. Etter asked Ken Wilson if she should keep records of overtime, and Wilson instructed her not to keep such records and not to worry about the issue of overtime.

8. Plaintiff has failed to show by a preponderance of the evidence that Defendant knew its conduct was in violation of the FLSA or that Defendant acted with reckless disregard for the matter of whether its conduct was in violation of the FLSA.

9. Defendant has failed to show by a preponderance of the evidence that its failure to pay Plaintiff overtime compensation was in good faith and with reasonable grounds to believe that it was in compliance with the FLSA.

10. As a NASCAR team, Defendant builds several cars and transports two of them, along with equipment and spare parts, to each of the NASCAR Winston Cup races which occur on an almost weekly basis from February to November. The custom-built tractor trailer that carries the cars and the equipment to and from the race sites is called a "transporter." The two cars are loaded into the top half of the transporter by being lifted to the top level by a hydraulic lift that is part of the tail of the trailer, rolled onto tracks that hold the cars inside the transporter, and then are "chocked" and strapped into the tracks. "Chocking" involves the clamping of the race car wheels into the tracks, through the use of a metal chock that attaches to the wheels and is then secured to the track by screws that are bolted onto the track. The car is then further secured with nylon straps that are placed around the wheels and the track. All other equipment is stowed inside the transporter in its designated place and is secured in some way for travel. The truck driver is responsible for

ensuring that all equipment is secured and stowed in a proper manner.

11. The transporter is assigned a United States Department of Transportation number that is displayed on the cab door. Defendant has had a DOT number since 1987.

12. As part of his job duties, Plaintiff was required to assist in the loading of the transporter before races at the shop and, when Plaintiff attended the race, the loading of the transporter after the race. Plaintiff assisted in loading the transporter by moving equipment to the hydraulic ramp at the end of the trailer, where it was placed in its final position by the truck driver and other shop employees, and by pushing the race cars into the transporter. Additionally, on two occasions, Plaintiff "chocked down" the wheels of a race car in their proper place on the track inside the transporter. Defendant has not shown by a preponderance of the evidence that Plaintiff took part in any other securing of equipment inside the transporter. Although other shop employees who worked with Plaintiff testified generally that everyone involved in loading the transporter at one time or another was likely to also secure items, none of these fellow shop employees could testify as to a specific instance when they remembered Plaintiff securing items within the transporter other than his having chocked down the wheels of a race car on the aforementioned two occasions.

13. Plaintiff's activities in connection with the loading of the transporter did not affect the safety of the transporter's operation.

14. When Plaintiff attended the races, he worked as part of the pit crew. The pit crew was divided into the "A" team and the "B" team. The "A" team went to the race site several days before each race to prepare for the race. Plaintiff, when he worked at races, was a member of the "B" team. The "B" team went to the race site on the morning of the race and returned after the race on the same day for all races except the spring Richmond race, both races in Atlanta, both races in Talladega, the race in Sonoma, the July race in Daytona, and the race in Phoenix. The "B" team went to the races either by charter plane or by company van.

## DISCUSSION

A. Title 29 U.S.C., Section 213(b)(1) Exemption

Defendant contends that Plaintiff is exempt from the overtime provisions of the FLSA by participating in loading activities affecting the safety of the operation of the transporter. The FLSA generally requires that certain employees be paid overtime for any hours in excess of forty that are worked during a week. *See* 29 U.S.C. § 207 (1994). However, the FLSA exempts from its overtime provisions "employee[s] with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49." 29 U.S.C. § 213(b)(1) (1994).

The Secretary of Transportation has the power to establish qualifications and maximum hours of service for employees who (1) are employed by motor carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation of passengers or property in interstate commerce. *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181–82 (11th Cir.1991) (citing 29 C.F.R. § 782.2(a)), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 941, 117 L.Ed.2d 111 (1992). In the case at bar, it is undisputed that Defendant qualifies as a "private motor carrier" subject to regulation by the Secretary of Transportation. Defendant contends that Plaintiff's activities in assisting in the loading of the transporter are activities "directly affecting the safety of operation" of the transporter, sufficient to bring Plaintiff's employment within the jurisdiction of the Secretary and the exemption of § 213(b)(1).

A loader is exempt from the provisions of the FLSA where his activity in connection with the loading of motor vehicles directly affects the safety of operation of the vehicle. *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 708, 67 S.Ct. 954, 960, 91 L.Ed. 1184 (1947). The Department of

Transportation, in an interpretative bulletin, focuses on the discretion and responsibility of the loader as key to the determination of whether the activity affects safety of operation:

> [A] "loader" [engages] in work directly affecting "safety of operation" so long as he has responsibility, when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized.

29 C.F.R. § 782.5(a) (1994). "It is the character of the activities rather than the proportion of either the employee's time or of his activities" that determines whether the employee's activities directly affect the safety of operation. *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 674, 67 S.Ct. 931, 944, 91 L.Ed. 1158 (1947). However, the mere handling of freight at a terminal, before or after loading, is insufficient of itself to constitute activity affecting safety of operation; such activity may form so trivial or occasional a part of the employee's activities, or be of such a limited nature, that the activities constitute "de minimus" activity which does not directly affect safety of operation. *Pyramid Motor Freight,* 330 U.S. at 708, 67 S.Ct. at 960.

■ In the case at bar, Plaintiff's only loading activities which could conceivably affect safety of operation fall into this "de minimus" category. First, Plaintiff's activity in bringing equipment to the lift of the transporter to be secured in its final place by others is not activity that can trigger the exemption. Moving equipment to the tailgate of a tractor trailer to allow the equipment to be actually loaded into its proper place in the trailer by others is not action affecting the safety of operation. *See Ispass v. Pyramid Motor Freight Corp.,* 78 F.Supp. 475, 477–78 (S.D.N.Y.1948). Defendant's position that Plaintiff's loading activities affected the safety of operation fails to distinguish between activity involving loading of equipment onto the end of the transporter and activity involving the securing and stowing of

equipment in its final position for transportation. Only the second category of activity affects safety of operation. Moreover, the only activity involving the securing of equipment by Plaintiff proven by a preponderance of the evidence is that Plaintiff on two occasions chocked down the wheels of race cars inside the transporter. This activity falls within the "de minimus" exception discussed by the Supreme Court in *Pyramid Motor Freight.* The evidence established that the chocks are only a preliminary securing device, to be used in conjunction with the nylon straps to secure the car inside the transporter. No evidence establishes that Plaintiff ever secured the nylon straps around the wheels of the cars, or in any other way secured any other item inside the transporter. Furthermore, Plaintiff secured chocks only two times during the approximate three year span he was employed by Defendant. Defendant has simply failed to establish that Plaintiff took part in activity that directly affects the safety of operation of the transporter. The § 213(b)(1) exemption does not apply to Plaintiff's employment with Defendant.

**B. Fluctuating Work Week**

■ Defendant next contends that Plaintiff is not entitled to all of the overtime compensation he seeks because he was paid a fixed salary for a fluctuating work week. Under regulations promulgated by the Department of Labor,

> [a]n employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number ... [the employee is entitled to additional one-half pay only for hours worked in excess of forty] since the employee has already received straight-time compensation on a salary basis for all hours worked.

29 C.F.R. § 778.114 (1994). Relying on *Zoltek v. Safelite Glass Corp.*, 884 F.Supp. 283 (N.D.Ill.1995), Defendant contends that this regulation applies to Plaintiff because Plaintiff was never docked pay when he was late to work or on a personal errand and was given paid vacation. However, both *Zoltek* and § 778.114 are inapplicable to the case at bar for one reason: Defendant has failed to establish that there was any "clear mutual understanding" regarding fluctuating hours. No evidence indicates that Defendant ever discussed such an arrangement with Plaintiff. Unlike the situation in *Zoltek*, Plaintiff here initially agreed to work forty hours a week, at no time agreed to different terms, and brought up the matter of overtime pay with his supervisor. Therefore, § 778.114 is not applicable to the case at bar. *See Burgess v. Catawba County*, 805 F.Supp. 341, 348 (W.D.N.C.1992).

### C. Overnight Travel Away From Home

■ Defendant next asserts that Plaintiff is not entitled to recover overtime compensation for travel time on race weekends where Plaintiff stayed overnight at the race site. A regulation issued by the Department of Labor provides:

> Travel that keeps an employee away from home overnight is travel away from home. Travel away from home is clearly work-time when it cuts across the employee's workday. The employee is simply substituting travel for other duties. The time is not only hours worked on regular working days during normal working hours but also during the corresponding hours on non-working days. Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days. Regular meal period time is not counted. As an enforcement policy the Divisions will not consider as worktime that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus, or automobile.

29 C.F.R. § 785.39 (1994). Under this regulation, Plaintiff is not entitled to compensation for travel time outside of normal working hours on race weekends where he stayed overnight at the race site.

Only eight of the races on the Winston Cup schedule involved overnight travel for Plaintiff: the spring Richmond race, both races in Atlanta, both races in Talladega, the race in Sonoma, the July race in Daytona, and the race in Phoenix. As to these races, Plaintiff may be compensated for travel time only during Plaintiff's normal working hours, 8:00 a.m. to 5:00 p.m. However, most of the race weekend entries on Plaintiff's calendars do not state the times of the day Plaintiff worked on these weekends or when the travel took place, instead showing only a total of hours worked. Without this specific information, the court has no basis for determining when the travel took place and what exactly is compensable for these weekends. Therefore, on overnight race weekends where Plaintiff has failed to specify the actual hours of the day he worked or traveled, no evidence exists upon which to base an overtime award and no overtime may be awarded for those dates. On overnight race weekends where Plaintiff does specify the actual hours of the day worked, however, Plaintiff is entitled to some compensation. Although the entries do not indicate when the travel took place, all of these entries encompass Plaintiff's normal working hours during which travel would be compensable under 29 C.F.R. § 785.39 and, therefore, the court may award Plaintiff compensation for those normal working hours. The failure to establish when the travel occurred prevents an award of any time outside of normal working hours on these weekends, because there is no basis for establishing whether this time was spent working or traveling. Therefore, Plaintiff will be awarded no overtime compensation for race weekends involving an overnight trip where his records do not specify the exact hours he worked, but will be credited up to eight hours of worktime for races involving an overnight trip where his records indicate the exact hours he worked.

### D. Willfulness and the Statute of Limitations

■ Actions to recover unpaid overtime compensation under the FLSA must be com-

menced within two years of the violation, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). A violation is willful where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). Plaintiff asserts that Defendant's violation of the FLSA is willful because Defendant never attempted to ascertain its duties under the FLSA after Plaintiff raised the issue with Ken Wilson, and because Ken Wilson stated that he believed the issue of overtime compensation for Plaintiff to be ridiculous. Furthermore, Plaintiff notes that Defendant was not aware of the potential applicability of the § 213(b)(1) exemption until after this litigation began.

■■■ Although it is a close question, Plaintiff has failed to establish that Defendant's violation of the FLSA is willful. Defendant may certainly have been negligent in failing to investigate its responsibilities under the FLSA, but Plaintiff has been unable to establish by a preponderance of the evidence that Defendant knew of its duties under the FLSA or reckless disregarded the possibility of their application. The mere failure to seek legal advice, standing alone, is insufficient to establish willfulness. *McLaughlin*, 486 U.S. at 134–35, 108 S.Ct. at 1682. Plaintiff can point to no pattern of complaints to Defendant or in the industry regarding overtime compensation that could establish knowledge or recklessness on the part of Defendant.

Given that Plaintiff cannot establish willfulness, a two-year statute of limitation applies to this action. Plaintiff filed this action on June 28, 1994. Therefore, Plaintiff may only recover for unpaid overtime accruing after June 28, 1992.

### E. Liquidated Damages

■■■ The FLSA provides:

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid

minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional amount as liquidated damages.

29 U.S.C. § 216(b). Liquidated damages are awarded in an amount equal to the employee's compensatory damages and are awarded in addition to compensatory damages. *Fowler v. Land Management Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir.1992). An award of liquidated damages is mandatory, but may become discretionary if the employer can establish "to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that his act or omission was not in violation of the [FLSA]." 29 U.S.C. § 260. Thus, unlike the issue of willfulness where Plaintiff bears the burden of proof, on the issue of liquidated damages Defendant bears the "plain and substantial burden" of proving that its actions were objectively reasonable and prompted solely by good faith to avoid imposition of liquidated damages. *Burgess*, 805 F.Supp. at 350. Furthermore, a finding that the employer did not willfully violate the FLSA in no way forecloses a finding that the employer did not act in good faith, as proof of an intentional violation of the FLSA is not necessary to obtain an award of liquidated damages. *Burgess*, 805 F.Supp. at 351.

■■■ Good faith requires some duty to investigate potential liability under the FLSA. *Horan v. King County*, 740 F.Supp. 1471, 1481 (W.D.Wash.1990). An employer cannot "simply remain blissfully ignorant of FLSA requirements" and avoid liability for liquidated damages. *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir.1984). In the case at bar, Defendant has set forth no justification for failing to investigate its potential liability under the FLSA other than Ken Wilson's belief that the FLSA did not apply and that overtime compensation for employees in the racing industry is a ridiculous notion. Defendant took no other action to determine if Plaintiff's employment fell within the purview of the FLSA. Defendant was not aware of the potential applicability of the § 213(b)(1) exemption until after this litigation began. Given this evidence, Defendant has failed to

establish that it acted in good faith in failing to comply with the FLSA. Plaintiff is entitled to an award of liquidated damages.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is proper in this district.

2. Defendant is an employer and enterprise engaged in commerce or the production of goods for commerce within the meaning of the Fair Labor Standards Act.

3. Plaintiff's employment by Defendant was subject to the provisions of the Fair Labor Standards Act. Defendant has failed to establish that Plaintiff's employment was exempt under the provisions of 29 U.S.C. § 213(b)(1).

4. Defendant's violation of the Fair Labor Standards Act was not willful within the meaning of 29 U.S.C. § 255(a). Therefore, a two-year statute of limitations applies to this action, and Plaintiff may recover only that overtime compensation that accrued after June 28, 1992.

5. Plaintiff is entitled to overtime compensation at one and one-half times his regular rate of pay for hours worked in excess of forty hours per week after June 28, 1992. As explained above, the court accepts Plaintiff's Exhibits 1, 2, and 3 as a credible and accurate record of his hours worked, except to the extent that they conflict with Defendant's attendance records. A week-by-week breakdown of the overtime compensation Defendant owes Plaintiff follows, with an explanation of the hours claimed by Plaintiff and any deductions from those hours made by the court for weeks when Plaintiff is not awarded the full amount of hours he claims:

### 1992

| | | | |
|---|---|---|---|
| 6/28–7/4: | no overtime claimed | | |
| 7/5–7/11: | 8.5 hrs @ $20.60 regular rate | = $ | 262.65 overtime pay |
| 7/12–7/18: | 6.5 hrs @ $20.60 regular rate | = $ | 200.85 |
| 7/19–7/25: | 19 hrs @ $20.60 regular rate | = $ | 587.10 |

(Plaintiff claims 25 overtime hours, but hours at Talladega race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

7/26–8/1:  0 hrs

(Plaintiff claims 14.5 overtime hours, but hours at Talladega race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

| | | | |
|---|---|---|---|
| 8/2–8/8: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 8/9–8/15: | 22.5 hrs @ $20.60 regular rate | = $ | 695.25 |
| 8/16–8/22: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 8/23–8/29: | 22.5 hrs @ $20.60 regular rate | = $ | 695.25 |
| 8/30–9/5: | 0 hrs | | |

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff out after 10:30 a.m. on 9/4 due to sickness.)

| | | | |
|---|---|---|---|
| 9/6–9/12: | 35 hrs @ $20.60 regular rate | = $ | 1,081.50 |
| 9/13–9/19: | 2 hrs @ $20.60 regular rate | = $ | 61.80 |

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be .5 hour late from lunch on 9/18.)

| | | | |
|---|---|---|---|
| 9/20–9/26: | 19.5 hrs @ $20.60 regular rate | = $ | 602.55 |
| 9/27–10/3: | 18.5 hrs @ $20.60 regular rate | = $ | 571.65 |
| 10/4–10/10: | 15 hrs @ $20.60 regular rate | = $ | 463.50 |

(Plaintiff claims 16.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 9:00 a.m. on 10/9.)

| | | | |
|---|---|---|---|
| 10/11–10/17: | 14.5 hrs @ $20.60 regular rate | = $ | 448.05 |
| 10/18–10/24: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 10/25–10/31: | 14 hrs @ $20.60 regular rate | = $ | 432.60 |
| 11/1–11/7: | 1.5 hrs @ $20.60 regular rate | = $ | 46.35 |

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be out 1 hour at the eye doctor on 11/6.)

| | | | |
|---|---|---|---|
| 11/8–11/14: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |

(Plaintiff claims 15 overtime hours, but hours at Atlanta race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

| | |
|---|---|
| 11/15–11/21: | 0 hrs |

(Plaintiff claims 12.5 overtime hours, but hours at Atlanta race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

| | | | |
|---|---|---|---|
| 11/22–11/28: | no overtime claimed | | |
| 11/29–12/5: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 12/6–12/12: | 1.75 hrs @ $20.60 regular rate | = $ | 54.08 |

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 9:15 a.m. on 12/11 due to dentist appointment.)

| | | | |
|---|---|---|---|
| 12/13–12/19: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 12/20–12/26: | no overtime claimed | | |
| 12/27–1/2: | 8.5 hrs @ $20.60 regular rate | = $ | 262.65 |

| | | |
|---|---|---|
| **TOTAL FOR 1992:** | $ | **6,929.33** |

### 1993

| | | | |
|---|---|---|---|
| 1/3–1/9: | 2.5 hrs @ $20.60 regular rate | = $ | 77.25 |
| 1/10–1/16: | 13.5 hrs @ $20.60 regular rate | = $ | 417.15 |
| 1/17–1/23: | 15.5 hrs @ $20.60 regular rate | = $ | 478.95 |
| 1/24–1/30: | 16 hrs @ $20.60 regular rate | = $ | 494.40 |
| 1/31–2/6: | 9 hrs @ $20.60 regular rate | = $ | 278.10 |

(Plaintiff claims 9.5 overtime hours, but Defendant's attendance records show Plaintiff out at 4:30 p.m. on 2/5 and no overtime claimed on that date.)

| | | | |
|---|---|---|---|
| 2/7–2/13: | 14 hrs @ $20.60 regular rate | = $ | 432.60 |

(Plaintiff claims 16 overtime hours, but Defendant's attendance records show Plaintiff to be in at 9:30 a.m. on 2/10.)

| | | | |
|---|---|---|---|
| 2/14–2/20: | 23.5 hrs @ $21.22 regular rate | = $ | 748.00 |
| 2/21–2/27: | 8.5 hrs @ $21.22 regular rate | = $ | 270.56 |
| 2/28–3/6: | 16.75 hrs @ $21.22 regular rate | = $ | 533.15 |

(Plaintiff claims 22.5 overtime hours, but hours at Richmond race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff, and Defendant's attendance records show Plaintiff to be out .75 hour on 3/5.)

3/7–3/13:      6 hrs @ $21.22 regular rate      = $     190.98

(Plaintiff claims 20 overtime hours, but hours at Richmond race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

3/14–3/20:      17.5 hrs @ $21.22 regular rate      = $     557.03

(Plaintiff claims 27.5 overtime hours, but hours at Atlanta race on 3/19 and 3/20 are limited to 8 each day because Plaintiff travelled overnight and lists specific hours of work but does not specify when travel occurred.)

3/21–3/27:      4 hrs @ $21.22 regular rate      = $     127.32
3/28–4/3:      17.5 hrs @ $21.22 regular rate      = $     557.03
4/4–4/10:      2.5 hrs @ $21.22 regular rate      = $     79.58
4/11–4/17:      17 hrs @ $21.22 regular rate      = $     541.11
4/18–4/24:      25.5 hrs @ $21.22 regular rate      = $     811.66

(Plaintiff claims 26 overtime hours, but on 4/19 Plaintiff lists work hours as 8:30 a.m. to 5:00 p.m. and does not denote a shortened lunch hour as in other days that week, therefore .5 hour is deducted on 4/19.)

4/25–5/1:      19 hrs @ $21.22 regular rate      = $     604.77

(Plaintiff claims 25 overtime hours, but Defendant's attendance records show Plaintiff into work at 12:00 noon on 4/26, so 4.5 hours are deducted on that date, and hours at Talladega race on 5/1 are limited to those occurring during normal working hours because Plaintiff travelled overnight and lists specific hours of work but does not specify when travel occurred.)

5/2–5/8:      14.5 hrs @ $21.22 regular rate      = $     461.54

(Plaintiff claims 21.5 overtime hours, but hours at Talladega race on 5/2 are limited to 8 because Plaintiff travelled overnight and lists specific hours of work but does not specify when travel occurred.)

5/9–5/15:      4.5 hrs @ $21.22 regular rate      = $     143.24

(Plaintiff claims 15 overtime hours, but hours at Sonoma race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

5/16–5/22:      9.5 hrs @ $21.22 regular rate      = $     302.38

(Plaintiff claims 27 overtime hours, but hours at Sonoma race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff, and only .5 of the travel hours from Sonoma on 5/17 may be included as working hours because all others are outside of Plaintiff's regular working hours.)

5/23–5/29:      10.5 hrs @ $21.22 regular rate      = $     334.22
5/30–6/5:      17.5 hrs @ $21.22 regular rate      = $     557.03
6/6–6/12:      13 hrs @ $21.22 regular rate      = $     413.79

(Plaintiff claims 14.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 9:00 a.m. on 6/10.)

6/13–6/19:      20.5 hrs @ $21.22 regular rate      = $     652.52
6/20–6/26:      20.5 hrs @ $21.22 regular rate      = $     652.52
6/27–7/3:      no overtime claimed
7/4–7/10:      2.5 hrs @ $21.22 regular rate      = $     79.58

7/11–7/17:     20.75 hrs @ $21.22 regular rate          = $   660.47

(Plaintiff claims 21 overtime hours, but Defendant's attendance records show Plaintiff in at 7:45 a.m. on 7/14.)

7/18–7/24:     20 hrs @ $21.22 regular rate             = $   636.60

(Plaintiff claims 25 overtime hours, but travel to Talladega on 7/24 is deducted because it is an overnight trip and Plaintiff does not specify hours of travel.)

7/25–7/31:     0 hrs

(Plaintiff claims 14.5 overtime hours, but hours at Talladega race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

8/1–8/7:       2.5 hrs @ $21.22 regular rate            = $    79.58
8/8–8/14:      16.75 hrs @ $21.22 regular rate          = $   533.15

(Plaintiff claims 17 overtime hours, but Defendant's attendance records show Plaintiff to be .25 hour late on 8/11.)

8/15–8/21:     17 hrs @ $21.22 regular rate             = $   541.11
8/22–8/28:     18.5 hrs @ $21.22 regular rate           = $   588.85

(Plaintiff claims 20 overtime hours, but Defendant's attendance records show Plaintiff to be out at 4:30 p.m. on 8/27.)

8/29–9/4:      8.5 hrs @ $21.22 regular rate            = $   270.55
9/5–9/11:      24.75 hrs @ $21.22 regular rate          = $   787.79

(Plaintiff claims 27.5 overtime hours, but Defendant's attendance records show Plaintiff to be out at 4:15 p.m. on 9/9.)

9/12–9/18:     1.5 hrs @ $21.22 regular rate            = $    47.75

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 8:30 a.m. on 9/14.)

9/19–9/25:     17.5 hrs @ $21.22 regular rate           = $   557.03

(Plaintiff claims 21.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 10:00 a.m. and out at 3:00 p.m. on 9/20.)

9/26–10/2:     .5 hr @ $21.22 regular rate              = $    15.91

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be in at 10:00 a.m. on 9/27.)

10/3–10/9:     21.75 hrs @ $21.22 regular rate          = $   692.30

(Plaintiff claims 23 overtime hours, but Defendant's attendance records show Plaintiff to be out at 4:45 p.m. on 10/4.)

10/10–10/16:   5 hrs @ $21.22 regular rate              = $   159.15

(Plaintiff claims 13.5 overtime hours, but Defendant's attendance records show Plaintiff to be out of work on 10/15 on personal business.)

| | | | |
|---|---|---|---|
| 10/17–10/23: | 14.5 hrs @ $21.22 regular rate | = $ | 461.54 |
| 10/24–10/30: | 15.5 hrs @ $21.22 regular rate | = $ | 493.36 |

(Plaintiff claims 29 overtime hours, but hours traveling to Phoenix race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

10/31–11/6:    0 hrs

(Plaintiff claims 16 overtime hours, but hours at Phoenix race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

11/7–11/13:    2.5 hrs @ $21.22 regular rate          = $    79.58

(Plaintiff claims 10.5 overtime hours, but hours traveling to Atlanta race are deducted because it is an overnight race and no specific hours of work are listed by Plaintiff.)

11/14–11/20:    2 hrs @ $21.22 regular rate          = $    63.66

(Plaintiff claims 11 overtime hours, but hours at Atlanta race are limited to 8 because Plaintiff travelled overnight and lists specific hours of work but does not specify when travel occurred.)

| | | | |
|---|---|---|---|
| 11/21–11/27: | no overtime claimed | | |
| 11/28–12/4: | 2.5 hrs @ $21.22 regular rate | = $ | 79.58 |
| 12/5–12/11: | 0 hrs | | |

(Plaintiff claims 2.5 overtime hours, but Defendant's attendance records show Plaintiff to be out sick on 12/9.)

| | | | |
|---|---|---|---|
| 12/12–12/18: | 2.5 hrs @ $21.22 regular rate | = $ | 79.58 |
| 12/19–12/25: | 0 hrs | | |

(Plaintiff claims 2 overtime hours, but Defendant's attendance records show Plaintiff to be out at 3:40 p.m. on 12/22.)

12/26–1/1:    2.5 hrs @ $21.22 regular rate          = $    79.58

**TOTAL FOR 1993:**                    $17,703.58

### 1994

| | | | |
|---|---|---|---|
| 1/2–1/8: | no overtime claimed | | |
| 1/9–1/15: | no overtime claimed | | |
| 1/16–1/22: | 5 hrs @ $21.22 regular rate | = $ | 159.15 |
| 1/23–1/29: | 12 hrs @ $21.22 regular rate | = $ | 381.96 |
| 1/30–2/5: | 12 hrs @ $21.22 regular rate | = $ | 381.96 |
| 2/6–2/12: | 10 hrs @ $21.22 regular rate | = $ | 318.30 |
| 2/13–2/19: | 20 hrs @ $22.38 regular rate | = $ | 671.40 |

**TOTAL FOR 1994:**                    $ 1,912.77

**TOTAL OVERTIME COMPENSATION:**        $26,545.68

6. Defendant has failed to show by a preponderance of the evidence that it acted in good faith and with reasonable grounds when it violated the FLSA. Plaintiff is, therefore, entitled to an additional award of liquidated damages in an amount equal to the overtime compensation owed him.

7. Pursuant to 29 U.S.C. § 216(b), Plaintiff is entitled to submit a petition for costs and attorney's fees.

A judgment in accordance with these findings of fact and conclusions of law shall be entered contemporaneously herewith.

### JUDGMENT

In accordance with the foregoing findings of fact and conclusions of law entered contemporaneously herewith,

IT IS HEREBY ORDERED AND ADJUDGED that judgment be entered in favor of Plaintiff Kenneth Troutt against Defendant Stavola Brothers, Inc. in the amount of Twenty Six Thousand Five Hundred Forty Five and 68/100's Dollars ($26,545.68) in unpaid overtime compensation and an additional amount of Twenty Six Thousand Five Hundred Forty Five and 68/100's Dollars ($26,545.68) in liquidated damages, for a total damages award of Fifty Three Thousand Ninety One and 36/100's Dollars ($53,091.36). Interest shall accrue on this judgment at the rate of 5.89% per annum from the date of entry of this judgment.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff may submit a petition for costs and attorney's fees associated with this matter within thirty (30) days of the date of this judgment.